TOBEINER, J.
 

 The services of two ranch hands, extending in one case for a period of over 45 years and in the other for a period of over 32 years, rendered to the ranch owners in reliance upon their promise that full payment for such services would be forthcoming when the ranch was sold, entitled the two men, according to the trial court, to the protection of an equitable lien upon the ranch for the value of such services. We agree with this holding. We do not believe that the decrees in the consolidated eases succumb to the blunderbuss attack of appellants Kitchen and Cantwell, who urge as
 
 *729
 
 alleged error: (1) the erroneous admission (a) of declarations against interest of appellant Kitchen’s deceased wife, Harriett, and (b) of the unsigned and unsworn depositions of two witnesses; (2) the prejudicial misconduct of respondents’ counsel in his attempt to introduce a letter of appellant Cantwell allegedly seeking to compromise the claim of one of the two ranch hands; (3) the erroneous imposition of an equitable lien on the ranch and rendition of a personal judgment against appellant Cantwell; (4) the insufficiency of evidence to support the findings (a) that the cause of action was not barred by the statute of limitations or laches, and (b) that a confidential relationship existed between respondents and the Kitchens.
 

 The issues emanate from a factual situation which is reminiscent of a social order of another day. In substance the two ranch hands, one hired in 1910 and another in 1923, contended, and proved to the trial court, that they had worked for the Kitchens in the belief that their unpaid compensation would be discharged when their employers were able to do so by the sale of the ranch. The relationship of the proprietor of agricultural lands with a farm employee who works as a servient “retainer,” almost a vestigial remnant of feudalism itself, may possibly occur in older California ranches or in dairies which preserve a European tradition, but it is rare. And yet it apparently evolved here.
 

 In 1910, John Kitchen, who was engaged in the printing business, purchased this Reliez Station Road Ranch, and he gave it to his wife. Mrs. Kitchen managed the ranch, and in June, 1910, she hired respondent Alviso. Originally Alviso took care of the horses, and later he did the cooking and housework; he received in compensation $10 per week plus room and board. Then, in 1923, the Kitchens employed respondent Dodd to work on the ranch on a similar basis.
 

 When, in 1931, the Depression struck California farmers, Mrs. Kitchen told the two workers that she and her husband were "in very hard circumstances ’ ’; that, although she could not pay them wages currently, she would, if they wished to stay and work for room and board, pay all the back wages when the ranch was sold. The two men agreed. Indeed, several days later, when Mr. Kitchen asked Dodd if Mrs. Kitchen had told him they could not pay wages at the time but would do so later when the ranch was sold, Dodd again signified his concurrence.
 

 
 *730
 
 In 1936, the Kitchens sold the lower 40-acre part of the 60-acre ranch, but they did not at that time discharge their past indebtedness to the two workers. Although neither Kitchen broached the subject of back wages to the men, Alviso testified that he “had confidence” in the Kitchens and believed that “whenever they got the money . . . they would pay me.” In March, 1947, Mrs. Kitchen died, and Mr. Kitchen inherited the ranch. It was then, after the long lapse from 1931, that Mr. Kitchen resumed paying respondents their wages. Despite their many years of past service, the farm hands did not ask for, or receive, an increase in the $10 weekly compensation with which they had started.
 

 In 1955 Kitchen conveyed the ranch to appellant Cantwell, his niece by marriage. She paid a gift tax on the transfer. Although, as Mr. Shanly’s deposition reveals, John Kitchen at one time had “the place up for sale for $90,000,” Cantwell paid Kitchen $20 for the conveyance “to make it legal.” Then, and subsequently on May 7, 1956, when he suffered a cerebral hemorrhage, Kitchen transferred “[ejvery bit” of his property to Mrs. Cantwell. Upon the latter occasion, Mr. Kitchen gave Mrs. Cantwell a power of attorney.
 

 Mrs. Cantwell exercised the power of attorney. She discharged the two men. In May, 1956, Mrs. Cantwell handed Alviso two checks, one in the amount of $50, carrying the notation, “In full to date,” and the other, in the amount of $200, labeled “Bonus Cheek.” In this manner the long labors of Alviso ended. On November 19, 1956, Dodd suffered a similar fate; Mrs. Cantwell’s attorney wrote him a letter terminating his services.
 

 The events themselves tell the story of this unique relationship, but many witnesses supplied a mass of detail, and we briefly set out the most significant.
 

 One Mr. Palmer, who, since 1908, had known Mr. Kitchen and, since 1915, Mrs. Kitchen, and had long been acquainted with Alviso and Dodd, testified that several years before her death Mrs. Kitchen said, “I’m not going to leave this property so some floozy will get it away from Jack.” “I’m going to take care of the boys.” And after Mrs. Kitchen’s death, her husband had said that he owed “the boys” money but was not able to pay.
 

 Mr. Reid, who knew the Kitchens since 1940, testified that in 1945, during discussions of the possible sale of part of the ranch property, he asked Kitchen about moving the house from
 
 *731
 
 the front portion of the property. According to Reid, Kitchen answered he wanted to keep the house, that it “would belong to the boys . . . working for him.” Reid said, “ [T]he boys were trusted by the Kitchens and the boys trusted the Kitchens. There was a trusting relationship. ...”
 

 In his deposition, Mr. Shanly, a close friend of Kitchen’s since 1885, stated that Kitchen, in response to Shanly’s attempt to pay a debt he owed to Kitchen, said, “. . . I owe King some money. Give it to him.” Shanly testified that the relationship between Kitchen and Alviso had been a pleasant one, except for the last few years when Alviso’s drinking annoyed Kitchen. On one occasion Kitchen had said, “I don’t know what in the dickens I am going to do with that fellow. He has been with me so long I can’t do anything with him. I promised Harriett [Kitchen] I would keep him.” “He promised Harriett to stay with me.” Mrs. Shanly gave similar testimony to that of Mr. Shanly except that she knew nothing of the conversation as to Shanly’s debt to Kitchen.
 

 Mrs. Parker, who ran the rest home where Kitchen resided after his stroke, testified that Kitchen talked continuously about Dodd; that he knew Dodd hadn’t been taken care of; that he intended to see that Dodd was cared for; that Dodd’s wages had not been paid. In response to Mrs. Palmer’s question as to whether Kitchen had been delinquent as to the wages he replied, ‘ ‘ [N] o, that it had been his wife had always taken care of it and he just had never gotten straightened out with the boys” and that “he hadn’t paid them anything after she died.”
 

 The decree impressed in favor of each claimant an equitable lien upon the property in the amount of $8,320, the “agreed value” of each respondent’s services for the
 
 832
 
 weeks he had worked. Respondents’ second cause of action for money had and received, based on quasi contract and trust, in the sum of $21,980 for each claimant, does not now concern us since respondents waived their right of appeal from the judgment denying recovery upon this cause of action. We turn to a separate analysis of each of the four noted objections which appellant has raised to the judgment.
 

 Appellant’s first contention lies in the alleged erroneous admission of the declarations of Mrs. Kitchen and of the depositions of Mr. and Mrs. Shanly. As to Mrs. Kitchen’s declarations, appellant condemns as hearsay Alviso’s testimony that Mrs. Kitchen told him that “they were in very hard cir
 
 *732
 
 cumstances, and would not be able to pay me now, and if I wished to stay . . . that she would give me my room and board, and she would—when she sold the ranch, when able, she would give us every cent that was coming to us.” We believe appellant’s objection fails on either one of the following two grounds.
 

 First, since the statement consisted of an admission that Mrs. Kitchen was indebted to respondent, it constituted a declaration against interest. In
 
 Mayfield
 
 v.
 
 Fidelity & Casualty Co.
 
 (1936), 16 Cal.App.2d 611 [61 P.2d 83], the court, when confronted with a situation in which a defendant insurance company claimed plaintiff had no insurable interest in the insured’s life, permitted into evidence admissions of the insured that he was indebted to plaintiff. Characterizing such statements as declarations against interest, excepted from the hearsay rule, the court points out, “The reason for the exception is that it is presumed that a declaration so made is truthful. The exception applies to declarations of deceased persons as well as to those of the living.” (P. 617.)
 

 Second, the attacked evidence was cumulative in that other and independent testimony established the fact that appellant Kitchen recognized his liability to respondents. “ [T]he reception of additional evidence tending to establish the same fact, even though erroneous, was not prejudicial to appellant. ’ ’
 
 (Mayfield
 
 v.
 
 Fidelity & Casualty Co., supra
 
 (1936), 16 Cal.App.2d 611, 618.) Alviso and Dodd testified to other conversations with appellant Kitchen, similar in content; for instance, to Alviso’s question, “How about this money we have coming to us?” Mr. Kitchen answered, “. . . ‘I know all about it,’ . . . ‘Just as soon as I’m able, and the ranch is sold’ . . . ‘You boys will get your money.’ ”
 

 Appellant’s further contention on the issue of erroneous admission of evidence rests upon the court’s acceptance of the depositions of the Shanlys that were “unread, unsworn, unsigned.” Yet the parties stipulated that “the deposition is to be filed and/or used in court; that if the deposition is not read, corrected, or signed, it may be used to all intents and purposes as though it were signed,' providing the witness has had a reasonable opportunity to sign it. . . .” Indeed, the record shows that appellant’s counsel stated as to the depositions, “There are all the usual stipulations concerning it.” Appellant’s brief fails to deny the stipulation.
 

 Appellant makes the point that the court, in accepting
 
 *733
 
 the depositions, referred to the former section 2016, Code of Civil Procedure, effective at the time of trial, and argues that the section did not apply to this action. The court’s admission of the deposition, however, finds full support in the stipulation. Whatever the comment of the trial court when it admitted the deposition, we are guided by the observation of
 
 People
 
 v.
 
 Sears
 
 (1861), 18 Cal. 635, “[W]e do not try the sufficiency of the arguments of the Judge, but only the soundness of his conclusions.” (P. 636.)
 

 Turning to appellants’ second major point, the alleged prejudicial misconduct of plaintiff’s counsel, we find it consists of counsel’s attempt to introduce a letter of appellant Cantwell offering Dodd $3,000 if he would take her side of the case against Alviso. Appellant insists that this letter constituted an inadmissible offer of compromise, and that respondent, despite adverse rulings of the court, repeatedly, both directly and indirectly, tried to get it into the record and to influence the court by it. We need not elaborate the point; the court rejected the proffered letter. Any contention that the rebuffed offers caused prejudice to appellant fall into the realm of the imaginative. This was a court, not a jury, trial.
 

 The third argument of appellants that an equitable lien should not be imposed upon the transferred ranch and that the constructive trust fails as to Mrs. Cantwell because she was a bona fide purchaser cannot withstand the underlying equities of this case.
 

 The long and close association of the Kitchens and the two workmen established a fiduciary relationship. Upon the conduct of a party inducing another to repose trust in him, and upon the reliance and detriment of that other flowing from that confidence, the law founds a relationship of trust. The breach of the trust, resulting in the unconscionable conveyance of property by the inducing party, imposes a constructive trust upon a donee and rehabilitates the injured party. Thus in
 
 Newton v. Pickell
 
 (1954), 201 Ore. 225 [269 P.2d 508], the Oregon Supreme Court imposed a constructive trust upon the husband’s son as to certain property which the husband had by an antenuptial agreement agreed to convey to his wife, but which he had gratuitously conveyed to his son.
 

 In recent cases in this state the courts have imposed constructive trusts and equitable liens in situations in which one party has accepted over long periods of time services from another who has relied on the promise and confidence extended
 
 *734
 
 by the recipient of the services. Such a case is
 
 Brunson
 
 v.
 
 Babb
 
 (1956), 145 Cal.App.2d 214 [302 P.2d 647], in which one brother worked for a pittance of compensation on the ranch of the other for a period of from 1919 to 1953, relying upon the promise that his brother would “ ‘. . . leave all his property to . . . [him] in fulfillment of the obligations. . . .’ ” (P. 218.) Rejecting the argument that the statute of frauds frustrated the claimant’s contention, holding that an estoppel prevented the raising of the statute, and impressing upon the property of the defaulting and decedent brother an equitable lien, the Second District Court of Appeal, through Justice White, held that the equity court “was justified in finding that an equitable lien was created. ...” (P. 229.)
 

 In
 
 Monarco
 
 v.
 
 Lo Greco
 
 (1950), 35 Cal.2d 621 [220 P.2d 737], a son devoted more than 20 years to the development of the property of his mother and stepfather, who promised “that if he stayed home and worked they would keep their property in joint tenancy so that it would pass to the survivor who would leave it to” the son. The decedent’s stepfather executed a will in breach of the oral agreement; the court imposed a constructive trust as to the property in favor of the son upon those taking from him.
 

 In the instant case the findings, supported by the evidence, sustain the imposition of the constructive trust. As the facts demonstrate, the Kitchens promised the ranch workers compensation when the ranch was sold; the workers relied upon the promise, accepting employment at the low wages paid them, rejecting opportunities to obtain employment at increased wages, and bestowing upon the owners the benefit of their services.
 

 The situation here differs from the ease in which the claimants have not undertaken substantive service, where their “forbearance ... is ephemeral,” and they have not “surrendered substantive rights ... by which . . . [the other party] correspondingly became unjustly enriched,” such as the situation in
 
 Fallon
 
 v.
 
 American Trust Co.
 
 (1959), 176 Cal.App.2d 381, 385 [1 Cal.Rptr. 386].
 

 The contention that the equitable lien fails because Mrs. Cantwell was a bona fide purchaser for value cannot be supported. Mrs. Cantwell testified that she paid only $20 for property which John Kitchen had offered for sale for some $90,000. She paid a gift tax on the property. These facts substantiate the finding of the trial court that Mrs. Cantwell
 
 *735
 
 received the property by way of gift. Appellant’s contention that she likewise promised Kitchen that “if he needed money . . . [she] would let him have it”; that “he could live in the house for as long as he wished,” and that she paid for his medical and institutional care does not change the substance of the transaction.
 

 We need not pass upon the propriety of the personal judgment against appellant Cantwell. Pending this appeal she paid the judgments in full, allegedly in order to avoid execution upon the property rendered imminent by her failure to secure a stay bond. As we have pointed out, we have found the lien valid. While appellant Cantwell paid the amount of the judgment under compulsion and thus did not lose her right of appeal, the personal judgment against her is immaterial in view of the proper judgment for the lien and the fact that the payment of the amount of the lien (which actually occurred here) would release the property, which was of far greater value than the amount of the judgment.
 

 Concluding that the court properly imposed the equitable lien upon the property, we next consider the fourth and final argument of appellant that the evidence does not support the findings that the cause was not barred by the statute of limitations and that a confidential relationship existed between respondents and the Kitchens.
 

 As to the statute of limitations, assuming the application of the pleaded section 339, Code of Civil Procedure, the statute “would not commence to run until there had been a repudiation ... by the trustee”
 
 (Cohn
 
 v.
 
 Goodday
 
 (1923), 191 Cal. 615, 627 [217 P. 756]) ; here, the repudiation of the trust, when the ranch was transferred to Mrs. Cantwell, occurred well within the two-year period. On August 23, 1955, John Kitchen gave the ranch to Mrs. Cantwell and on February 5, 1957, respondents filed their complaints. As to laches, the lapse of such a short period under the circumstances of this case does not constitute a bar. During the long years of their service respondents relied upon the promise that they would be paid when the ranch was sold; the failure to litigate then does not bar their action now, when the promise lies broken and unfulfilled. As the court said in
 
 Cohn
 
 v.
 
 Goodday, supra
 
 (1923), 191 Cal. 615, “The plaintiffs had a right to rely upon their brother’s acceptance and faithful administration of the trust he had assumed, and their failure to insist upon a division of the trust property during the long years of his devotion of its proceeds to the care of their ill and indigent
 
 *736
 
 sister cannot be attributed as a fault or held to defeat their present cause of action.” (P. 627.)
 

 Appellant’s final contention on this point, that the evidence fails to substantiate the existence of a confidential relationship between respondents and the Kitchens, does not bear an analysis of even the salient facts as we have recited them above.
 

 In conclusion we believe that equity properly established a constructive trust in this case; it imposed an equitable lien upon the ranch property to secure to the workers payment for their rendered services. The promise of compensation when the ranch was sold, the confidence reposed in the ranch owners by these workers, the reliance they placed in their employers, finally yield a merited protection. The equitable lien does not succumb to the variety of technical defenses raised by appellants.
 

 We affirm the judgment.
 

 Bray, P. J., and Duniway, J., concurred.