[Civ. No. 21964. First Dist., Div. Two. June 28, 1965.]

YUKIO KANEDA, Plaintiff, Cross-defendant and Appellant,
v. TAMOTSU KANEDA, Individually and as Adminis-
trator, etc., Defendant, Cross-complainant and Respond-
ent; KAYO KANEDA et al., Interveners and Respond-
ents.

MacGowan & MacGowan and Calabro, Calabro & Calabro for Plaintiff, Cross-defendant and Appellant.

Lee W. Rodgers, Crist, Peters, Donegan & Brenner and John M. Brenner for Defendant, Cross-complainant and Respondent and Interveners and Respondents.

BRAY, J.*—Plaintiff and cross-defendant Yukio Kaneda appeals from a judgment declaring, *inter alia,* that the real property at issue is held by him and Tamotsu Kaneda for the benefit of the heirs of Kojiro Kaneda deceased and that he is not entitled to a partition of said property.[1]

## Questions Presented

1. Is there a resulting trust for Kojiro and his heirs or an express trust for benefit of Yukio and Tamotsu?

2. Did the court fail to find on a material issue—Hoge's authority?

3. Is the finding of a resulting trust contrary to law because of the former California Alien Land Act?

4. Does the statute of limitations bar defendants' claims?

5. Were Kojiro's statements admissible?

6. Does the evidence support Findings III and VI?

## Record

Yukio, the eldest son of Kojiro who died in 1942, brought this action against his brother Tamotsu for partition of a parcel of real property alleging that he and his brother owned the property as tenants in common by virtue of the deed from Frank Hoge hereinafter described. Tamotsu answered and filed a cross-complaint in which he alleged that Hoge had held the property on a resulting trust for Kojiro and his heirs, and that he and Yukio were so holding the property. As administrator of Kojiro's estate, Tamotsu also filed a complaint in intervention making the same claim. The other five children of Kojiro also intervened to the same effect. All of the answering defendants and interveners asked that it be declared that Yukio and Tamotsu held the property in trust for all seven of Kojiro's children or that the property be declared an asset of the latter's estate.

Kojiro was a resident of California but a citizen of Japan and supposedly ineligible to own land in California. In 1928 he paid the purchase price of a lot in Palo Alto, which property is the subject of this action. Title was taken in the name of Frank Hoge, an attorney. There are three buildings on the property. One contained living quarters of the family. Initially Kojiro operated a laundry there on the premises, later

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1] The members of the Kaneda family herein involved will hereafter be referred to by their first names.

switching to a dry cleaning business. He ran the business assisted by Mr. and Mrs. Miyahara, with his children helping out to some extent. Hoge paid the bills with money furnished by Kojiro.

Kojiro had two wives both of whom predeceased him. Yukio (Duke), Tamotsu (Tom), Kiyoko, Kei or Kayo (Kay), Kinji (Kin), and Fumako (Furuiko) are children by his first wife, George being a child by his second wife.

In October 1935 Kojiro went to Japan leaving behind the two eldest sons, Yukio and Tamotsu, his second wife and their son George, and taking the other children with him. He intended to return in six months but did not return, remaining there until his death in 1942 apparently leaving no will. While in Japan he received no income from the property.

The laundry and his family were left under the management of Myrtle Miyahara. The family and Myrtle all lived in the living quarters behind the laundry and were supported from the profits of the laundry and cleaning business. During World War II the family and the Miyaharas were forced to evacuate the property.

In September 1941 Hoge conveyed the property to Yukio and Tamotsu by deed reciting that he was ''trustee.'' Hoge never explained why he executed this deed.

Mrs. Miyahara testified that in September of 1941 it was necessary to borrow money for equipment for the cleaning business and for a home, since the living quarters on the property were too small for her family and the three Kaneda boys. Yukio, then past 21, and Tamotsu, then only 20, consented to her using the property as security for a loan of $7,000. Kojiro was not consulted. Apparently it was in connection with the obtaining of this loan that the deed from Hoge to Yukio and Tamotsu was made. Mrs. Miyahara did not know the mechanics or procedure for the deed. As Tamotsu was a minor, Mrs. Miyahara was appointed guardian of Tamotsu in order to sign the note for him. $7,000 was thus obtained on the property. Part of the money was used to purchase a home where the Kaneda children and Mrs. Miyahara went to live. Mrs. Miyahara understood that as long as Kojiro was alive the property was his. Mrs. Miyahara obtained a tenant, Hinmon, who took over and operated the business during the period of evacuation. The rentals were received and expenses paid by Attorney Crist, who regularly reported to Mrs. Miyahara the income from the Kaneda property and her own property.

Yukio did not return to the property after the war. Tamotsu returned in 1948 to take over the operation of the business and the care of the property. His father had always indicated that Tamotsu should operate the business. To get the business in condition Tamotsu borrowed $5,000 on a note signed by him and Yukio. This note Tamotsu paid. Yukio refused a partnership in the business offered him by Tamotsu. Yukio discussed selling the property but Tamotsu refused. Yukio never made any request or attempt to enter the property or to use it for any purpose.

Kayo returned from Japan in 1950. For three years he lived with Tamotsu and his family helping run the business. Tamotsu furnished him board and room, gave him an allowance and supported him through school. Tamotsu made no regular payments to any of the other children, but gave them money from the business whenever they wanted it.

Tamotsu testified that before 1948 he "went along" with the fact that he was to operate the business, but it never entered his mind that he owned one-half of the property. His state of mind relative to the ownership of the property had not changed since 1948, and he did not consider himself a one-half owner, although when Yukio asked for his half, based upon what Yukio told him, Tamotsu assumed that he and Yukio each owned one-half of the property. Yukio suggested that the property be sold, but Tamotsu did not agree because he didn't want to split it half-and-half and did not believe he was one-half owner, feeling that the property should be divided among all the brothers and sisters. Neither Yukio nor Tamotsu ever told Mrs. Miyahara or any of the family that either owned one-half of the property.

The trial court found that in taking title by the deed from Hoge, Yukio and Tamotsu did so as trustees for Kojiro and his heirs, and now hold title to the property under a resulting trust for the benefit of the heirs of Kojiro subject to administration in his estate and it denied Yukio's petition for partition. Judgment was entered accordingly.

1. *The Resulting Trust.*

The parties agree that Frank Hoge held the title to the property as trustee. The dispute is as to the kind of trust of which Hoge was trustee. Yukio contends that Hoge held as trustee of an express oral trust for the benefit of Yukio and Tamotsu which trust was executed upon his conveyance to them in 1941. Defendants contend that Hoge held as trustee

of a resulting trust which arose in favor of Kojiro when he paid the purchase price of the property and placed legal title in Hoge's name or that Hoge held as the trustee of an express oral trust for the benefit of all children of Kojiro.

Pursuant to Civil Code section 853,[2] the payment of the purchase price by Kojiro and the taking of title in the name of Hoge give rise to a presumption that Hoge held the title in trust for Kojiro. See *Emden* v. *Verdi* (1954) 124 Cal.App.2d 555 [269 P.2d 47], holding that ''it is the natural presumption in such a case [payment by one person and the taking of title in the name of another] that it was the intention of the parties that the ostensible purchaser should acquire and hold the title to the property for the one who furnished the purchase price. . . . Such a presumption is evidence to be weighed by the trial court along with all the other facts in the case.'' (P. 558.) Other facts which supported a resulting trust were the payment of taxes on the property by Kojiro; his maintaining, repairing, use and possession of the property; and the testimony of Mrs. Miyahara that until his death Kojiro considered himself to be the owner of the property.

Neither Yukio nor Tamotsu gave any consideration for the Hoge deed. The evidence shows that it was made solely to enable Mrs. Miyahara to obtain a loan.

At the time of the Hoge deed, Kojiro had been in Japan approximately six years. Mrs. Miyahara testified that when Kojiro left for Japan he left orders to put ''the two kids' names'' on the property.

At the time of the trial Hoge was 80 years old and his health did not permit him to testify. His deposition, however, was taken. When shown the deed and asked ''Who were you trustee for'' he replied ''Well, it looks like Yukio Kaneda and Tamotsu Kaneda.'' To the question '' [D]o you remember that you were trustee for those two boys mentioned in the deed'' he answered that it was his recollection that he was trustee for the two boys. Hoge's statements did not amount to a clear statement of any authority from Kojiro to make the deed, a deed of which Kojiro was apparently unaware. Yukio testified that he could not recall ever going to Hoge's office with his father, and that at least until the deed was executed he thought that title stood in his father's name.

---

[2]Civil Code section 853 provides: ''When a transfer of real property is made to one person, and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made.''

Mrs. Miyahara testified that she and Kojiro had more than one discussion about the property; that he told her that as an alien he couldn't buy any property so he had to have Mr. Hoge as trustee for himself; that Kojiro never referred to the property as the property of anyone other than himself; that he never referred to the property as that of Yukio or Tom (Tamotsu) or Yukio and Tom, nor had she ever heard anyone refer to it as such; that during Kojiro's lifetime there was never any mention of ownership of the property being in someone other than Kojiro; that notwithstanding her signature to a document which declared Yukio and Tamotsu to be the owners of the property, she didn't think the two owned the property but that it belonged to all the children; that the boys' names were on the deed because Kojiro could not buy property in his name and the two children's names were on the property to protect it for Kojiro. Mrs. Miyahara further testified that Kojiro said that if someone is interested in the property, "to keep up the cleaning," he will have the property after his death; that when Kojiro was in Japan, he wrote her instructing her to pay the property taxes; that before she went to see Mr. Crist, the attorney who arranged the loan, she knew that Mr. Hoge was the owner of the property; that she did not see Mr. Hoge from prior to the time Kojiro left for Japan until she asked to be appointed guardian of Tom; and that she "guessed" that the attorney had told her the property was in the boys' names and therefore she would have to be appointed guardian in order to borrow money. Lastly, Mrs. Miyahara stated that when she returned from the relocation camp, Kojiro had died, and she believed that whoever was going to run the business would automatically own the property no matter what was on any piece of paper. By shaking her head negatively, she indicated that she did not know the difference between the legal and beneficial interest in property, and she averred that as long as Kojiro was alive, she believed the property was his.

Assuming, as claimed by plaintiff, that a presumption arose from the execution of the deed by Hoge as trustee that he had authority from the trustor to make it, because a fiduciary is presumed to have performed his duty, the evidence clearly overcomes such presumption. As said in *Widney* v. *Southern Pacific Co.* (1932) 120 Cal.App. 291, 295 [7 P.2d 1046] (cited by plaintiff), the presumption applies "in the absence of evidence to the contrary."

Applying the well known rule stated in *Emden, supra,* page 559, "After hearing all the evidence, observing the witnesses, taking into consideration their relation to the transaction and to the appellant, their interest in the case, and evaluating their testimony and then resolving the conflicts in the evidence and the inferences to be drawn therefrom, the trial judge has found adversely to appellant on the question of the intent with which this conveyance to appellant was made. Such finding has substantial evidentiary support and therefore it is binding on appeal." And also applying section 2243 of the Civil Code which holds, "Everyone to whom property is transferred in violation of a trust, holds the same as an involuntary trustee under such trust, unless he purchased it in good faith, and for a valuable consideration," the evidence clearly supports the court's finding that Yukio and Tamotsu received title to the property without consideration, with knowledge of the existence of the trust in favor of Kojiro and his heirs, and subject to that trust.

### 2. *Failure to Find on Hoge's Authority*

Plaintiff Yukio argues that the court's failure to make any finding of fact upon the issue of Hoge's authority in making the conveyance to Yukio and Tamotsu was a failure to find on a material issue and, therefore, reversible error. The trial court did not specifically find that Hoge did NOT have Kojiro's consent to make the conveyance, but such a finding was not necessary. Here, the findings that Yukio and Tamotsu are not the owners of the property, that they hold legal title in trust, and that the property was conveyed to them with knowledge of the trust imply a finding that no express oral trust existed for the two boys. As the court iterated in *Cordasco* v. *Scalero,* 203 Cal.App.2d 95, 107 [21 Cal.Rptr. 339] : "It is axiomatic that the appellate courts continually uphold judgments in spite of failure to find specifically on a material issue, where there are other more general findings from which the omitted finding follows by necessary implication. (*New* v. *New* (1957) 148 Cal.App.2d 372, 388 [306 P.2d 987].) Neither is it necessary, when a proper finding is made upon an issue, to negate issues contradictory thereto, since the finding on the first issue is an implied negation of all contrary propositions. (. . . *Brown* v. *Schroeder* (1927) 88 Cal.App. 192 [263 P. 325], [201: "It is not always necessary to make a specific finding as to each of several material issues where the findings taken as a whole,

or construed together, clearly show that they include the court's conclusion upon all the material issues. (*Rossi* v. *Beaulieu Vineyard,* 20 Cal.App. 770 [130 P. 201].)"]; *Kleg-man* v. *Moyer* (1928) 91 Cal.App. 333 [266 P. 1009], [346: "If sufficient can be gathered from the whole of the findings of the court that material issues are fairly determined, the findings will support the judgment (*Berry* v. *Crowell,* 55 Cal. App. 537 [203 P. 835].) ▮▮ From the facts found and from the judgment ordered it is evident, in the light of the entire record, that if more complete findings had been made they would have been adverse to the contentions of appellant. If that be so, the failure to find further is not ground for reversal. (*Krasky* v. *Wolpert,* 134 Cal. 338 [66 P. 309].)"].)"

### 3. *California Alien Land Act*[3]

▮ Plaintiff contends that as Kojiro was an alien ineligible to own land in California and therefore under the Alien Land Act was prohibited from owning property here, there could be no resulting trust.

That act provided so far as pertinent here, that all aliens ineligible for citizenship (and it is conceded that Kojiro was such) could not acquire, possess, enjoy, use, cultivate, occupy or transfer real property or any interest therein; that "[e]very transfer of real property, or of an interest therein, though colorable in form, shall be void as to the state and the interest thereby conveyed or sought to be conveyed shall escheat to the state as of the date of such transfer, if the property interest involved is of such a character that an alien mentioned in section two hereof is inhibited from acquiring, possessing, enjoying, using, cultivating, occupying, transferring, transmitting or inheriting it, and if the conveyance is made with intent to prevent, evade or avoid escheat as provided for herein." The act further provides that the taking of property in the name of a person other than an alien ineligible for citizenship raises a presumption that it was taken with intent to violate the act if the consideration was paid or agreed to be paid by such alien.

In *Sei Fujii* v. *State* (1952) 38 Cal.2d 718, Gibson, C. J., critically analyzed the Alien Land Law, and at pages 737-738 [242 P.2d 617] concluded, "The California Alien Land Law is obviously designed and administered as an instrument for effectuating racial discrimination, and the most searching

---

[3]Statutes 1921, page lxxxiii, as amended by Statutes 1923, chapter 441, page 1020, and Statutes 1927, chapter 528, page 880.

examination discloses no circumstances justifying classification on that basis. There is nothing to indicate that those alien residents who are racially ineligible for citizenship possess characteristics which are dangerous to the legitimate interests of the state, or that they, as a class, might use the land for purposes injurious to public morals, safety or welfare. Accordingly, we hold that the alien land law is invalid as in violation of the Fourteenth Amendment.''

In *Brandenstein* v. *Hoke* (1894) 101 Cal. 131, 134-135 [35 P. 562], the court quoted from *Norton* v. *Shelby County,* 118 U.S. 425, 442 [6 S.Ct. 1121, 30 L.Ed. 178], '' 'An unconstitutional act is not a law. It confers no rights. It imposes no duties. It affords no protection. It creates no office. *It is, in legal contemplation, as inoperative as though it had never been* passed' '' (Italics added; see also *Smith* v. *Mathews* (1909) 155 Cal. 752, 762 [103 P. 199].)

If the Alien Land Act is as inoperative as though it had never been passed, plaintiff cannot now rely upon it to avoid the resulting trust in favor of Kojiro. While there is language in *Yorty* v. *Anderson* (1963) 60 Cal.2d 312, 316 [33 Cal.Rptr. 97, 384 P.2d 417], which indicates that under some circumstances, the language of *Norton, supra,* may be too broad, the Alien Land Act conferred only upon the state the right to act against the alien ineligible to hold title to real property. A private citizen can seek no refuge by its provisions. The law was as stated in Restatement Second of Trusts, section 444, comment f, page 406: ''By statute in a few States land acquired by aliens or certain classes of aliens is subject to forfeiture to the State. In such States the equitable interest of an alien beneficiary of a trust of land is likewise subject to forfeiture. . . . In such States if an alien pays the purchase price for land and at his direction the land is transferred to another under such circumstances that a resulting trust would arise if the payor were not an alien, a resulting trust arises in favor of the alien, and his interest is subject to forfeiture to the State.''

Plaintiff Yukio relies on three cases to establish that a resulting trust could not have arisen in favor of Kojiro, because he was an alien ineligible to hold California real property: *Estate of Yano,* 188 Cal. 645 [206 P. 995]; *People* v. *Fujita,* 215 Cal. 166 [8 P.2d 1011]; and *Jue* v. *San Tong Jue,* 163 Cal.App.2d 231 [329 P.2d 560].

In *Yano, supra,* the father, a Japanese citizen, purchased real property in the name of his 2-year-old daughter who

was a United States citizen. He sought to be appointed the guardian of her estate. No question of resulting trust was involved. The trial court refused to appoint him, holding that the child had no property because the deed was taken in the child's name solely to evade the laws of the State of California. The reviewing court reversed holding that as a United States citizen she was entitled to hold property real and personal. The court stated: "Even a conveyance to an alien disqualified under the law to hold real estate has been generally held to convey title to such alien, until the same is divested by the state or by inquisition had upon its denouncement. This was so even under the common law which excluded aliens from acquiring and holding real property. [Citations.] It is apparent that the present alien land law recognizes the same rule, as it provides that action shall be brought by the state for the escheat of any lands conveyed to aliens in contravention of the act.'' (P. 650.) It further held that the nature and extent of the minor's property rights could not be determined in the guardianship proceeding. The court by way of dicta then stated: ''The fact that the father paid the consideration for the transfer of this land to the minor does not establish a trust in the father's favor under section 853 of the Civil Code. Where aliens are prohibited from holding lands, an implied trust by operation of law will not arise in their favor. [Citations from other jurisdictions.] Besides, the attempt of the alien to obtain title through such a trust would be in violation of the alien land law, and could not be enforced.'' (P. 650.) The court did not analyze the result of this dicta, for it could have resulted in the unjust enrichment of the trustee and the deprivation of the state of its right to claim that the property escheated. Furthermore, it conflicted with the court's statement first above quoted.

In *People* v. *Fujita, supra,* a Japanese citizen purchased agricultural land, placing title thereto in the names of his four minor children, in joint tenancy. The state sued to escheat the land under the Alien Land Law. The reviewing court followed *Yano, supra,* without elaboration, and held that the presumption of section 853 of the Civil Code did not apply because of the father's ineligibility to own land. The court held that the evidence showed that the purchase of the land was made for the benefit of the children and that the father had no interest in it, and denied the escheat.

*Jue* v. *San Tong Jue, supra,* was decided after the Alien Land Law was declared unconstitutional. There a Chinese

ineligible to own property under the Alien Land Law had in 1919 purchased real property. His first American born child, Corinne, arrived the same year. The property was purchased from one Anderson, and the deed, dated October 29, 1919, conveyed title in trust to the title company. The declaration of trust stated that the property was held by the title company in trust for O. F. Brant, beneficiary. The specified purpose of the trust was to convey " 'upon written demand' " to said " 'O. F. Brant or order.' " O. F. Brant and Sue E. Brant assigned the beneficial interest to Corinne on November 7, 1919. On March 18, 1940, Corinne, by letter, directed the title company to convey Lot 690 to her, and on March 19, Corinne signed a receipt for an unrecorded quitclaim deed of the property and her acknowledgment of the termination of the trust. Corinne was then over 21 years of age. Corinne had been told many times, from her earliest childhood up to her father's death in 1941, that she was " 'to hold title to Lot 690 . . . for the benefit of the family,' " and she had always told her father that she would. On appeal, family members assigned as error the decision that Lot 690 was held as tenants in common by Jue Joe's widow, surviving children and a grandchild serving as administratrix of her deceased father's estate, and they urged that the trust was invalid because of the uncertainty of its terms. The widow, Leong Shee, had been born in China, and the language of the opinion reflects that it is a reasonable inference that community funds were used to purchase the property at issue. By the judgment, the trial court undertook to enforce the trust "for the family" as to the whole of Lot 690. The court stated, "There is in the record no direct evidence that Jue Joe included himself among the beneficiaries of the trust, and it has been held by the California Supreme Court that no such presumption arises from the fact that an alien parent ineligible for citizenship paid the purchase price of land conveyed to his American-born child. (*Estate of Yano*, 188 Cal. 645, 650 [206 P. 645] . . . .) Nor did any such presumption arise from the fact that the alien father occupied the land. (*People* v. *Fujita*, 215 Cal. 166, 170, 171 [8 P.2d 1011].) " (P. 241.) Yet the court concluded, with respect to Lot 690, "We are persuaded by the entire record on the instant appeal that it was not error for the court to enforce the trust in favor of the 'family' of Jue Joe." (P. 244.) The appellants' petition for a hearing by the Supreme Court was denied. Inasmuch as Leong Shee was a beneficiary of the family trust

declared valid, and she would have been ineligible to hold land under the Alien Land Law, absent a showing that no community funds were used to purchase Lot 690, the court, in effect, upheld a resulting trust for that portion of the property declared to be owned by Leong Shee.

The Alien Land Law had a provision (§ 2) which allowed aliens ineligible to citizenship to "acquire, possess, enjoy, use, cultivate, occupy and transfer real property, or any interest therein, in this state, and have in whole or in part the beneficial use thereof, in the manner and to the extent, and for the purposes prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject. . . ."

When Kojiro purchased the property in 1928, there had been in effect since 1911 a treaty with Japan, article I of which provided, in part, "The citizens or subjects of each of the High Contracting Parties shall have liberty to enter, travel and reside in the territories of the other to carry on trade, wholesale and retail, to own or lease and occupy houses, manufactories, warehouses and shops, to employ agents of their choice, to lease land for residential and commercial purposes, and generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established." The treaty between the United States and Japan was abrogated on January 26, 1940. The testimony established that the property in question served both as a house and a cleaning shop. By the terms of the treaty, Kojiro was not an ineligible alien as to this property. (See *Palermo* v. *Stockton Theatres, Inc.*, 32 Cal.2d 53 [195 P.2d 1].)

When one considers that the Supreme Court of this state last expressed itself on the presumption of Civil Code section 853 with respect to ineligible aliens over 30 years ago at a time when the Alien Land Law was believed to be a valid statute, that that court has since declared the statute unconstitutional, that the voters of California subsequently repealed the Alien Land Law,[4] the conditions no longer prevail which evoked the declaration that the presumption of Civil Code section 853 did not apply where property was purchased by an alien ineligible to hold it. Knowledge of grave injustices done under the guise of the Alien Land Act added to the above

---

[4]Statutes 1955, chapter 316, page 767; Statutes 1955, chapter 1550, page 2831, and approved as Proposition 13 at the general election held November 6, 1956.

facts lead to the conclusion that the trial court did not err in finding a resulting trust in favor of Kojiro.

### 4. *Statute of Limitations*

Yukio argues that the period of the statute of limitations for a resulting trust is four years (Code Civ. Proc., § 343), and the time period begins to run at the time that the trust is repudiated by the trustee. This, he claims, occurred when the trustee, Frank Hoge, conveyed to Yukio and Tamotsu in 1941, yet the claims of the interveners as the heirs of Kojiro and of Tamotsu as the administrator of his estate were not asserted until March 1962, more than 20 years after the repudiation. Yukio further claims that a resulting trust was repudiated again when the real property was rented from 1941 to 1948 and the rentals remaining after payment of expenses were used for Yukio and Tamotsu, and again in 1948 when Tamotsu took over the business and kept all the rents and profits for himself.

Defendants make three contentions in reply to Yukio's claim that the statute of limitations is a bar to asserting a resulting trust.

■ (1) When there is a breach of a resulting trust, the statute of limitations does not commence to run until the beneficiaries have knowledge or notice of the repudiation.

■ Plaintiff Yukio relies on *Bradley Bros.* v. *Bradley* (1912) 20 Cal.App. 1 [127 P. 1044], to support his contention that Code of Civil Procedure section 343 (an action for relief not otherwise provided for) bars defendants' claim. *Bradley Bros., supra,* was an action to have it adjudged that defendant held title to certain real property as trustee for plaintiff and that legal title be conveyed to it. Code of Civil Procedure section 343 was pleaded in bar of the action. The court held that the action was one to determine the ownership of the property in dispute and to compel a conveyance of the title thereto to the rightful owner. It was, therefore, an action for the recovery of real property within the meaning of Code of Civil Procedure section 318 (action for recovery of real property requiring that plaintiff or his predecessor be in possession within five years before the commencement of the action), and hence Code of Civil Procedure section 343 had no application to the action. A petition for hearing by the Supreme Court was denied. The court indicated, however, that the statute of limitations commences to run when the trustee conveys to someone other than the cestui que trust (p. 4). But the same reason which applied to *Bradley Bros., supra,* applies in the

case at bench, i.e., this is primarily an action to determine ownership of property.

*Cohn* v. *Goodday* (1923) 191 Cal. 615 [217 P. 756], was an action to have it declared (1) that Abe Cohn during his lifetime held, and that the defendants as his successors in interest hold, the legal title to the real estate in question in trust to convey the same to plaintiffs; (2) that plaintiffs, the surviving brothers and sisters, be adjudged the owners of an undivided interest; and (3) that defendants be required to execute and deliver a deed conveying to plaintiffs their respective shares in said real estate. The original express trust was created by the transaction between Hirsh Cohn and his two sons, Levi Cohn and Charles Cohn. Charles expressly assumed the obligations of the trust upon the retirement of Levi Cohn from the trusteeship, and these obligations were cast upon Harry Cohn by the conveyance to him of the property by a grant deed absolute in form. He, in turn, cast upon Abe Cohn, by a grant deed absolute in form, the obligations of the trust. Abe, like his brothers who had served as trustees, was a beneficiary of the original trust and was familiar with its terms. When Abe died, his administratrix denied the trust's existence. The court cited *Bradley Bros., supra,* and held that the action was one to determine the ownership of property; that Code of Civil Procedure section 343 did not apply; that Abe Cohn became and continued during his lifetime to be the voluntary trustee of a constructive trust where he had taken over the trust property by a grant deed absolute in form with full knowledge of the trust by which it was burdened and with no other consideration than his agreement to fulfill the conditions of the trust. The court stated, at page 627, "[W]e are satisfied that upon the facts of this case the trust sought to be established and enforced in this action was a voluntary constructive trust against the enforcement of which the statute of limitations would not commence to run until there had been a repudiation thereof by the trustee. [Citations.] There was no such repudiation. . . . The plaintiffs had a right to rely upon their brother's acceptance and faithful administration of the trust he had assumed, and their failure to insist upon a division of the trust property . . . cannot be attributed as a fault or held to defeat their present cause of action."

In *England* v. *Winslow* (1925) 196 Cal. 260 [237 P. 542], the court cited *Cohn, supra,* and stated, "[T]he authorities are uniform in holding that the statute of limitations does not

begin to run in favor of such a trustee until there has been a repudiation of his trust. [Citations.]'' (P. 271.) (To the same effect: *Dodd* v. *Cantwell*, 179 Cal.App.2d 727, 735 [4 Cal.Rptr. 113].) In *Conway* v. *Moore*, 70 Cal.App.2d 166, at 173 [160 P.2d 865], Peters, P. J., stated, ''The rule as to such trusts is that the period of limitations commences to run from the time the trustee repudiates the trust, or, more accurately, from the time the beneficiary acquires knowledge or notice of the repudiation. Mere lapse of time, without repudiation does not affect the rights of the beneficiary.''

In the case at bench, the deed from Frank Hoge stated that he was ''trustee.'' Testimony established the deed was given solely so that Mrs. Miyahara could obtain a loan using the property as security and about which loan and deed, Kojiro had no knowledge. Neither Yukio nor Tamotsu specifically testified that, in 1941, he was aware of or had seen the deed. If, in 1941, Tamotsu and Yukio saw the conveyance from Frank Hoge to them, they took with notice of a trust, and the rule of *Cohn* v. *Goodday, supra,* applies. Even if they were unaware of the deed, since they gave no consideration for it, under Civil Code section 2243, they held as involuntary trustees. Tamotsu, as cotrustee, did not repudiate the trust, and Kayo testified that in a conversation with him, Tamotsu agreed that the property should be divided seven ways. It appears from the evidence that the other defendants-beneficiaries had no knowledge of Hoge's repudiation prior to 1960; that they made no claim of an interest in the property until approximately November 1960, and, therefore, they are not barred by the statute of limitations.

(2) Defendants contend that the statute of limitations never runs in favor of a trustee as against the beneficiary while the beneficiary is in possession of the property, citing *Berniker* v. *Berniker* (1947) 30 Cal.2d 439, 448 [182 P.2d 557], and cases cited therein. Yukio argues that *Berniker, supra,* involved a resulting trust which had never been repudiated by the trustee; that the court held that the statute therefore had not started to run; and that, by way of dictum, the court stated that as the cestui que trust was at all times in possession, the statute would not commence. (See also *Stoll* v. *Selander* (1947) 81 Cal.App.2d 286 [183 P.2d 935].)

Either Kojiro, his agents the Miyaharas, or his agents' tenant (Hinmon) had possession of the property from the time of its purchase until 1948. In 1948, Tamotsu, a beneficiary as an heir of his father, took possession and has had

possession ever since. There was a possible conflict in the evidence as to the nature of Tamotsu's possession after the war. However, the trial court found that Tamotsu was in possession as a cotenant, and that the other six children were his cotenants. This finding is not unreasonable in view of the evidence that Tamotsu returned to the property because someone had to take care of it and run the business; that he refused to sell the property because he didn't feel that he and Yukio each owned one-half; and that he felt the property should be divided among all the children. Inasmuch as Tamotsu has been in possession as a beneficiary, the statute of limitations had not started to run when suit was commenced.

█ (3) The statute of limitations does not run so long as the constructive trustee recognizes the rights of the beneficiary and holds the property for him.

█ When the property was conveyed from Hoge to Yukio and Tamotsu without consideration, they became involuntary or constructive cotrustees (Civ. Code, § 2243). "[W]here the person charged as constructive trustee at first recognizes the rights of the plaintiff and voluntarily holds the property for him, the statute will not run until he or his successors repudiate. (*Cohn* v. *Goodday* [*supra*]. . . .)" (1 Witkin Cal. Procedure (1954) p. 664.)

Following the 1941 conveyance, the Miyaharas continued to possess the property and run the business for Kojiro. The Miyaharas leased the property to Hinmon during the evacuation. In 1948, Tamotsu took possession of the property, doing so as a cotenant with the other children, and as one of the constructive trustees. He refused to sell the property and divide the proceeds with Yukio. In 1960, Tamotsu again refused to partition. Neither Yukio nor Tamotsu ever told their other brothers and sisters that they had no interest in the property, and neither one tried to exclude their kinsmen from the possession or use of the property. Furthermore, Tamotsu agreed that the property should be divided seven ways.

When Kayo returned from Japan in 1950, he lived on the property with Tamotsu for three years. Tamotsu supported Kayo through school during this time, and Kayo helped run the business. Tamotsu testified that he gave money from the business to the others as they needed it.

Yukio took no action when Tamotsu refused his request to partition the property. His failure to act amounted to a recognition of the rights of the other children, at least up until the time that Yukio brought this suit.

### 5. *Kojiro's Statements*

 Plaintiff contends that the court admitted into evidence over his objection on the ground of hearsay, numerous statements purportedly made by Kojiro to witnesses who testified at the trial. These statements were to the effect that Kojiro thought of himself as the owner of the property and that he intended that it should go upon his death to all of his children or to the one who ran the laundry and cleaning business. The evidence to which Yukio objected was offered partially to answer Yukio's contention that the property was held on an express trust for him and Tamotsu, and partially to prove defendants' case by showing that the father intended that title be held for him, not for the two boys.

 *Hansen* v. *Bear Film Co.* (1946) 28 Cal.2d 154 [168 P.2d 946], was an action to establish a trust concerning certain corporate stock. As to the admission at the trial of statements made by the trustor, Oscar, of the type of statements made by Kojiro in our case, the court said, ''Appellants contend that the trial court erred in admitting in evidence oral and written declarations of ownership of the stock and of the company made by Oscar, not within the presence or to the proved knowledge of Josephine, but subsequent to the transfers to her and in derogation of them. [Citations.] However, under well recognized exceptions to the hearsay rule, such declarations, made before, at the time of, or subsequent to the transfers, were properly admissible . . . on the issue of a claimed gift, and also to show the intent or state of mind of Oscar. [Citations.]

''The rule is succinctly stated in *Whitlow* v. *Durst, supra,* 20 Cal.2d [523] at pp. 524-525 [127 P.2d 530] : 'When intent is a material element of a disputed fact, declarations of a decedent made after as well as before an alleged act that indicate the intent with which he performed the act are admissible in evidence as an exception to the hearsay rule, and it is immaterial that such declarations are self-serving. Thus, in cases involving the delivery of deeds, declarations of the alleged grantor made before and after the making of the deed are admissible upon the issue of delivery, and it is immaterial that such declarations are in the interest of the party producing them. [Citations.] . . .'

''Appellants claim that the parol evidence rule precluded the trial court from admitting oral proof to show that the purportedly absolute transfers were in fact transfers of legal title only, subject to an oral trust to reconvey upon demand.

In support of this position they cite the Restatement, Trusts, section 38, page 122, and 1 Scott on Trusts, section 38, page 226, where the text in part reads: '. . . Conversely, extrinsic evidence is not admissible to show that the grantor intended that the grantee should hold the property upon trust, if the instrument of transfer clearly states that he is to hold the property for his own benefit, free of trust.' Here the written instrument purported only to divest the transferor of title and vest it in the transferee. It contained no recital that the transferee was to hold the property for her own benefit, nor did it mention a trust or beneficial interest. Under the circumstances, the applicable rule is that found in the Restatement, *supra,* section 38, subdivision 3: 'If the owner of property transfers it inter vivos to another person by a written instrument in which it is not declared that the transferee is to take the property for his own benefit or that he is to hold it in trust, extrinsic evidence may be admitted to show that he was intended to hold the property in trust either for the transferor or for a third party.' [Citations.]'' (Pp. 173-175.)

There was no error in admitting Kojiro's statements.

### 6. *Findings III and VI*

Finding III is to the effect that the Hoge deed conveyed the legal title to Tamotsu and Yukio subject to the trust, without consideration and with knowledge by the grantees of the existence of said trust. As we have hereinbefore shown there is ample evidence to support this finding.

Finding VI states: ''That Tamotsu Kaneda and Yukio Kaneda have not repudiated said trust.''

It has already been shown that Tamotsu did not repudiate the trust, and that he felt and agreed that the property should be divided seven ways. Since Yukio and Tamotsu were co-trustees, they had to unite in any act to bind the trust property. (Civ. Code, § 2268.) Yukio could not effectively repudiate the trust without Tamotsu's concurrence. Furthermore, Yukio at no time expressed or gave notice of a repudiation of the trust to any of the other children who were beneficiaries other than Tamotsu until he filed his action for partition.

The evidence fully supports this finding.

Judgment affirmed.

Shoemaker, P. J., and Taylor, J., concurred,